UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                      Case No:  2:14-cr-68-FtM-38DNF

RODNEY DAVIS

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

 **I.  Introduction**

 This cause is before the Court on Defendant Rodney Davis's Motion to Suppress

Evidence (Doc. 21) filed on August 30, 2014.  The Government filed a Response to Defendant's

Motion to Suppress Evidence (Doc. 23) on September 12, 2014.  This matter was referred to the

Court for a report and recommendation and an evidentiary hearing was held before the

undersigned on September 19, 2014.  At the hearing, the Court granted the parties leave to file

supplemental authority in support of their positions.  On September 26, 2014, the Government

filed a Supplemental Memorandum of Law Regarding Defense Motion to Suppress (Doc. 36),

and on September 27, 2014, Defendant filed a Supplemental Memorandum of Law in Support of

Motion to Suppress (Doc. 37).  A Transcript (Doc. 34) (hereinafter referred to as "Tr." followed

by the appropriate page number) of the evidentiary hearing was filed on September 25, 2014.

Defendant is charged with possessing a firearm while being a person convicted of a crime

punishable by imprisonment for a term exceeding one year. (Doc. 1).  For the reasons explained

below, the Court respectfully recommends that Defendant's motion be **GRANTED IN PART**

**AND DENIED IN PART**.

## II.    Evidence

The Government presented the testimony of three witnesses: Officer Edward Quinn, Officer Jason Petaccio, and Detective Jimmy Hernandez.  The Government entered two exhibits into evidence: Exhibit 1, two photographs of the firearm found in the vehicle Defendant was driving before he was arrested, and Exhibit 2, a copy of the Affidavit and Application for Search Warrant of the vehicle Defendant was driving before he was arrested.  Defendant called no witnesses and submitted no exhibits into evidence.

### A.  Testimony of Officer Edward Quinn

On direct examination, Officer Quinn testified as follows.  He has worked for the Fort Myers Police Department for 11 years and is currently assigned to the Violent Crimes Task Force. (Tr. 4).  His job duties entail patrolling the high-crime areas of Fort Myers. (Tr. 4).

Officer Quinn testified that he had previously arrested Defendant on October 8, 2013. (Tr. 5).  Upon arresting Defendant, Officer Quinn learned that Defendant was a convicted felon and that his driver's license was suspended. (Tr. 5).  In early December of 2013, Officer Quinn saw Defendant talking to another man at the intersection of Cleveland and Hanson Street. (Tr. 6).  Officer Quinn ran Defendant's name through the NCIC database and learned that his license was suspended. (Tr. 6-7).

On December 27, 2013, Officer Quinn again encountered Defendant. (Tr. 7).  While stopped with his partner, Officer Birch, at the intersection of Carrell Street and Evans Street, Officer Quinn observed Defendant driving a silver 2014 Chevrolet Malibu[1]. (Tr. 7).  Defendant was making a left turn and looked towards the officers. (Tr. 7).  Defendant turned his head away

---

[1]  Defendant was actually driving a 2014 Chevrolet Impala.  Officer Quinn corrects himself on this point later in his testimony. (Tr. 24).

as if he did not want to be seen by the officers. (Tr. 7).  Officer Quinn's partner, who was driving, turned their patrol car around and began to tail Defendant while Officer Quinn began running Defendant's name on his computer to see if his license was still suspended. (Tr. 7).  Defendant turned north onto Glenn Street and then began to drive very fast. (Tr. 8).  Defendant pulled into the front yard of the residence at 3521 Glenn Street, immediately exited the vehicle and began walking towards the front door of the house. (Tr. 8).  Officer Quinn and his partner did not have their patrol car's lights and sirens on as they followed Defendant. (Tr. 8).

Officer Birch pulled in front of the house and Officer Quinn got out of the patrol car. (Tr. 8).  When he exited the vehicle, Officer Quinn's computer system was still searching and had not returned any results. (Tr. 8).  Officer Quinn told Defendant to "Come over here.  I need to speak to you for a minute." (Tr. 8).  Defendant did not say anything in response but walked back to the front of the car. (Tr. 8).  Officer Quinn told Defendant to "Come here.  I need to talk to you." (Tr. 8).  Officer Quinn explained that he made these comments because he wanted to be closer to Defendant in case the search came back that his license was suspended. (Tr. 8).

Defendant began to walk away real fast.  Officer Quinn then said "Hey, come over here. Stop." (Tr. 9).  Defendant then began running away to the fence line and then through the back yard of the house north of their location. (Tr. 9).  Officer Quinn did not chase after Defendant because he was unsure if anybody else was in the vehicle. (Tr. 9).  Officer Quinn told his partner to drive around and try to cut Defendant off. (Tr. 9).  Officer Quinn then went back behind the car to see if anyone was laying down in the car. (Tr. 9).  He then approached it from the passenger's side and, because of the morning sun, could not see well into the car due to the reflections on the windows.  (Tr. 9).  He then looked through the front windshield and saw a firearm laying on the floorboard of the passenger's side. (Tr. 9).

Officer Quinn was concerned that Defendant may have another firearm and notified Officer Birch on the radio. (Tr. 10).   Officer Quinn was not involved in the foot chase but eventually Defendant was apprehended. (Tr. 11).   Defendant was brought back to Officer Quinn's patrol car. (Tr. 11-12).   Officer Quinn asked Defendant if he had the keys to the vehicle and Defendant said that the keys were in his pocket. (Tr. 12).   Defendant's pockets were searched but the keys to the car were not found. (Tr. 12).   Officer Quinn told Defendant that the keys were not in his pocket and Defendant responded, "What keys?" (Tr. 12).

On cross examination, Officer Quinn testified that the basis for his actions was the belief that Defendant's driver's license was suspended. (Tr. 13).   Officer Quinn testified that in early December, when he saw Defendant and performed a database search to see if Defendant's license was suspended, he did not write a report or otherwise document this search. (Tr. 13-14).   Officer Quinn testified that he never mentioned the early December database search in his previous deposition while the case was in state court. (Tr. 14).   Officer Quinn testified that he was unable to state the precise date in early December when he ran the search on Defendant. (Tr. 15).

Officer Quinn testified that there are different types of license suspensions and that some suspensions last longer than others. (Tr. 19).   Officer Quinn testified that he did not know on October 8, 2013, why Defendant's license was suspended. (Tr. 20).   Officer Quinn testified that he did not know the status of Defendant's license before he came in contact with Defendant in front of the residence on Glenn Drive. (Tr. 21).   It was not until after Defendant was arrested that Officer Quinn found out that Defendant had a points suspension. (Tr. 22).

Officer Quinn testified that buccal swabs are sometimes taken from arrestees, but not all felony arrestees are swabbed. (Tr. 30).   Officer Quinn testified that Lee County Jail is where Defendant was booked and processed, not at the Fort Myers Police Department. (Tr. 31).

On redirect examination, Officer Quinn testified that he and his partner did not stop Defendant's vehicle, but only pulled behind it. (Tr. 32). Referring to his testimony during the state deposition in May 2014, Officer Quinn explained that he did not consider the running of Defendant's name in early December 2013 a "prior dealing" with Defendant because he did not talk to Defendant at that time. (Tr. 33).

On re-cross examination, Officer Quinn testified that he could not recall whether his patrol car was directly behind Defendant's vehicle when he approached Defendant in front of the house on Glenn Drive. (Tr. 34-35).

**B.  Testimony of Officer Jason Petaccio**

Officer Petaccio testified as follows. He has been employed with the Fort Myers Police Department since July 2006 and is currently assigned to the Violent Crimes Task Force as a patrol officer. (Tr. 36). On December 27, 2013, Officer Petaccio heard a call from Officer Quinn and Officer Birch that they needed assistance apprehending an individual that had fled from them. (Tr. 37). Officer Quinn advised over the radio that he had conducted a traffic stop, an individual had fled from the vehicle, and he had observed a firearm inside the vehicle the driver had exited. (Tr. 37). Officer Petaccio responded and set up a perimeter in the area. (Tr. 37). He saw an individual hopping fences which later turned out to be Defendant. (Tr. 37).

At some point in time Officer Petaccio had the opportunity to observe Defendant's vehicle. (Tr. 38). He approached the vehicle on the passenger's side. (Tr. 38). He looked through the front windshield, towards the passenger floorboard, along the center console area and observed a black handgun. (Tr. 38). The vehicle was sealed and Officer Petaccio contacted Alligator Towing to remove the vehicle from the scene. (Tr. 38).

Officer Petaccio participated in obtaining the search warrant of the vehicle Defendant was driving. (Tr. 39).  After obtaining the search warrant, he and other officers returned to the Fort Myers Police Department, where the vehicle was secure, read the search warrant, and had Alligator Towing unlock the vehicle. (Tr. 40).  Several items were found in the vehicle including a black Glock 31C .357 caliber handgun located on the front passenger side floorboard, $6,696 in the center console, a receipt bearing Defendant's name located in the trunk, three cell phones in various locations in the vehicle, and photographs of several individuals. (Tr. 40).  After the search was completed, the vehicle was removed from the sallyport and moved to Alligator Towing's storage yard. (Tr. 41).

Officer Petaccio then continued Defendant's booking. (Tr. 41). He made sure all the evidence submissions and the booking sheet were completed. (Tr. 41).  He then brought Defendant up for an interview regarding the events that had taken place. (Tr. 41).  After the interview, Detective Hernandez obtained a buccal swab from Defendant for DNA purposes. (Tr. 41).  According to Officer Petaccio, although at the time of the incident it was a common policy of the Fort Myers Police Department to obtain a buccal swab in any felony arrest, the decision to do so was at the discretion of the detective and was not done in every case. (Tr. 41).

On cross examination, Officer Petaccio testified that the buccal swab of Defendant was taken at his discretion. (Tr. 43-44).  Officer Petaccio testified that a Fort Myers Police report provides that the buccal swab was obtained from Defendant for DNA comparison to the firearm by the Florida Department of Law Enforcement. (Tr. 44).   Officer Petaccio testified that the buccal swab was taken after the booking procedures were complete, separate and apart from the normal booking procedures. (Tr. 46).

On redirect examination, Officer Petaccio stated that the taking of the buccal swab was part of the booking procedure.  He testified that the DNA swab was taken to compare for identification purposes. (Tr. 52).

### C.  Testimony of Detective Jimmy Hernandez

Detective Hernandez testified as follows.  Detective Hernandez is a property detective with the Fort Myers Police Department. (Tr. 53).  On December 27, 2013, he was asked by Officer Petaccio to obtain a buccal swab from Defendant. (Tr. 53).  Detective Hernandez testified that the buccal swab was taken for identification purposes. (Tr. 53).  On cross examination, Detective Hernandez testified that the purpose of taking the buccal swab was to see if it could be compared to the firearm that had been seized. (Tr. 55).

### III.    Analysis

Defendant argues that suppression is warranted on five grounds.  As stated by Defendant, they are: (1) both the initial stop and detention of Defendant were unlawful; (2) any statements made by Defendant were the product of this illegal detention; (3) the seizure of the firearm was the product of the illegal detention; (4) the search warrant was invalid, as the Government cannot establish that it was predicated on lawfully obtained information; and (5) all DNA evidence must be suppressed as the non-consensual taking of a DNA sample violated the Fourth Amendment. (Doc. 21 p. 3).

### A)  Whether the initial stop and detention was unlawful and evidence derived from the stop must be suppressed

Defendant argues that he was illegally seized within the meaning of the Fourth Amendment at the time the officers initially approached him. (Doc. 21 p. 4).  Defendants contend that the officers had no information that Defendant could not lawfully drive on December 27, 2013, and thus, the stop and detention was invalid. (Doc. 21 p. 4).  Additionally, Defendant adds

that if he was not seized at the time the officers initially came in contact with him, he would have been perfectly within his rights to terminate the encounter and attempt to leave the area. (Doc. 21 p. 5).  Therefore, the police chase and subsequent arrest would still be a violation of the Fourth Amendment. (Doc. 21 p. 5).

The Government argues that the officers did have reasonable suspicion that Defendant was committing a crime of driving while license suspended, revoked, cancelled or disqualified in violation of Fla. Stat. § 322.34(2). (Doc. 23 p. 4).  The Government also contends that the officers had probable cause to stop and detain Defendant after Officer Quinn observed and notified the other officers that he had seen a firearm in Defendant's vehicle. (Doc. 23 p. 4).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  "It is by now axiomatic that a court must examine the totality of the circumstances in order to determine whether a search or seizure is reasonable under the Fourth Amendment." *United States v. Lewis*, 674 F. 3d 1298, 1303 (11th Cir. 2012) (citing *Samson v. California*, 547 U.S. 843, 848 (2006)).  Law enforcement officers may seize a suspect for a brief investigatory stop only if they have a reasonable suspicion that the suspect committed a crime. *Terry v. Ohio*, 392 U.S. 1, 16 (1968).  According to the Supreme Court, reasonable suspicion requires "some minimal level of objective justification" that is something more than an "inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citations omitted).

A person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544 (1980).  Examples of

circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Id.* Law enforcement officers, however, "do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the persons is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer*, 460 U.S. 491, 497 (1983).

The Court must determine at what point the officers effectuated a stop of Defendant and whether the officers had the prerequisite reasonable suspicion necessary to justify the stop under the Fourth Amendment. In this case, the Court finds that Defendant was stopped at the time Officer Quinn exited his vehicle and approached Defendant. Based on his own testimony, Officer Quinn did not approach Defendant and ask him if he was willing to answer some questions. Instead, Officer Quinn approached Defendant and gave the imperatives "Come here. Come over here. I need to speak to you for a minute," and "Come here. I need to talk to you." (Tr. 8). As Defendant began walking away, Officer Quinn commanded, "Hey, come over here. Stop." (Tr. 8). Officer Quinn's statements were made to Defendant after the officers had turned their patrol car around and followed Defendant to the place he parked his vehicle. Under these circumstances, a reasonable person would have believed that he was not free to leave. Officer Quinn, in fact, thought so himself when he testified that he was initiating an investigative stop when he approached Defendant. (Tr. 21). Defendant also appeared to believe he was not free to leave as evidenced by his attempt to flee from the officers.

As Defendant was seized at the moment Officer Quinn approached him, it must be determined whether reasonable suspicion supported the stop.  The Government relies on two grounds to support probable cause: Officer Quinn's belief that Defendant's license was suspended and Defendant's reaction to seeing the police on December 27. (Tr. 57).

At the hearing, Officer Quinn testified that he first learned that Defendant's license was suspended when he arrested Defendant in October 2013. (Tr. 5).  Further, Officer Quinn testified that upon seeing Defendant on a street in early December 2013, he checked on the status of Defendant's license and found that it was still suspended. (Tr. 6).  Defendant argues Officer Quinn's testimony does not support a finding of reasonable suspicion for two reasons.  First, Defendant argues that Officer Quinn's testimony that he checked Defendant's license status in early December 2013 is not credible because Officer Quinn never documented this license check in any way, never mentioned it in his prior deposition, and gave no reason why he could specifically say that the license check happened in December. (Doc. 37 p. 4).  Second, Defendant argues that Officer Quinn's knowledge in October 2013 that Defendant's license was suspended does not support probable cause because Officer Quinn's knowledge was stale and he knew nothing of the nature of Defendant's license suspension. (Doc. 37 p. 4-5).

The case law cited by the parties shows that courts generally consider the recency of law enforcements knowledge of the suspension and the nature of the suspension.  *See United States v. Laughrin*, 438 F.3d 1245 (3d Cir. 2006) (information no less than twenty-two weeks old could not justify a stop in the absence of testimony as to the length of the suspension); *United States v. Woods*, 471 F. App'x 914 (11th Cir. 2010) (holding that a stop occurring 122 days after one year suspension for driving under the influence took effect was justified); *United States v. Pierre*, 484 F.3d 75 (1st Cir. 2007) (holding that five months old information that a driver's license was

suspended was justified because the suspension was for one year and the driver was regularly monitored by police); *State v. Leyva*, 599 So.2d 691, 693 (Fla. 3d DCA 1992) (finding that information that was four to five weeks old still justified the stop where the driver's suspension was for five years).   If the only basis Officer Quinn had for stopping Defendant was his knowledge that Defendant's license was suspended in October of 2013, the Court would find that the stop was not supported by reasonable suspicion.   The length of time between Officer Quinn's knowledge of the suspended license in October and the arrest on December 27, 2013, combined with Officer Quinn's lack of knowledge concerning the nature of the license suspension would not support reasonable suspicion.[2]

In this case, however, the Court finds that Officer Quinn had reasonable suspicion to believe that Defendant's driver's license was suspended on December 27, 2013, based on Officer Quinn's check of Defendant's driver's license status in early December.   Contrary to Defendant's arguments, the Court finds that Officer Quinn's testimony that he checked the status of Defendant's driver's license sometime in early December 2013 is credible.   Officer Quinn's sworn testimony is not undermined by the fact that the search was not recorded in any police report, because there would be no reason for him to do so.   When Officer Quinn checked on Defendant's driver's license status in early December 2013, Defendant was not driving and had no outstanding warrants. (Tr. 6-7).   Officer Quinn did not approach Defendant or initiate any type of encounter that would require Officer Quinn to write a report.   Therefore, it is unremarkable to the Court that this license check was not documented in any way.

---

[2] According to the search warrant application to search Defendant's vehicle, Defendant's license was not suspended until December 6, 2013. (Gov. Ex. 2 p. 8).  Evidently, between the time Officer Quinn first learned of Defendant's license suspension in October 2013 and Defendant's ultimate arrest on December 27, 2013, there passed a period of time in which Defendant's license was not suspended.

Likewise, the Court does not find that Officer Quinn's testimony is undermined by his failure to mention the license check when he was deposed in May 2014. As was made clear in his redirect examination, Officer Quinn did not consider the December 2013 license status check a "dealing with Defendant" as he never talked or interacted with Defendant at that time. (Tr. 33). Thus, Officer Quinn's failure to mention the December license check when asked at the May 2014 deposition "what were your prior dealings with [Defendant]?" does not undermine the credibility of his testimony that he checked the status of Defendant's license in December 2013. (Tr. 16).

The relevant issue then is whether Officer Quinn's knowledge in early December 2013 that Defendant's license was suspended gave him reasonable suspicion to stop Defendant on December 27, 2013. The Court finds that it does. At most, Officer Quinn's knowledge of Defendant's driver's license suspension was 21 days old when Officer Quinn initiated his stop of Defendant, as Defendant's license was not suspended until December 6, 2013. Based on the length of time found to be sufficient in the cases cited above, the length of time in this case between Officer Quinn's early December license check and Defendant's arrest was not so long as to make Officer Quinn's knowledge stale. Further, Officer Quinn's lack of knowledge regarding the type of license suspension Defendant had in early December does not automatically undermine a finding of reasonable suspicion. Although courts consider the recency of law enforcements knowledge of the suspension and the nature of the suspension in determining whether an officer's prior knowledge of a license suspension gives reasonable suspicion for the officer to initiate a stop for driving without a license, there is no binding law that requires that an officer to actually know the nature of a suspect's license suspension. The overarching consideration is whether, under the totality of the circumstances, there is a reasonable suspicion

of criminal activity. *United States v. Arizu*, 534 U.S. 266, 273 (2002). Knowledge of the nature of a license suspension may contribute as one more fact under the totality of the circumstances, but it is not a *per se* requirement to find reasonable suspicion. *See e.g. United States v. Sandridge*, 385 F.3d 1032 (6th Cir. 2004) (in which the Sixth Circuit never considered whether an officer had knowledge of the nature of a suspect's license suspension, yet nevertheless found a traffic stop was supported by reasonable suspicion based on an officer's knowledge from three weeks prior that the suspect's driver's license was suspended).

In this case, Officer Quinn's knowledge of Defendant's license suspension in early December 2013, combined with Defendant's conduct upon seeing the officers on December 27, 2013 (i.e., turning his face away from officers to conceal his identity and driving quickly away from the officer's patrol car) gave the officer's more than an"inchoate and unparticularized suspicion or hunch" that Defendant was committing the crime of driving with a suspended license. For these reasons, the Court finds that Defendant was legally seized when he was initially approached by Officer Quinn. Given this finding, the Court rejects Defendant's arguments that any statements made by him were a product of an illegal detention, the seizure of the firearm was the product of an illegal detention, and that the search warrant was invalid as it was predicated on unlawfully obtained information.

**B) Whether the buccal swab obtained from Defendant violated the Fourth Amendment and/or Fla. Stat. § 943.325**

Fla. Stat. § 943.325 provides that any qualifying offender who is arrested in Florida shall be required to submit a DNA sample to a department-designated facility at the time they are booked in a jail, correctional facility, or juvenile facility. Fla. Stat. § 943.325(7). A "qualifying offender" is any person who is

1.      a. Committed to a county jail;

- 13 -

b. Committed to or under the supervision of the Department of Corrections, including persons incarcerated in a private correctional institution operated under contract pursuant to s. 944.104;

c. Committed to or under the supervision of the department of Juvenile Justice;

d. Transferred to this state under the Interstate Corrections Compact, part III of chapter 941; and who is

2.    a. Convicted of any felony offense or attempted felony offense in this state or of a similar offense in another jurisdiction;

b. Convicted of a misdemeanor violation s. 784.048, s. 810.14, s 847.011, . 847.013, s. 847.0135, or s. 877.26, or an offense that was found, pursuant to s. 874.04, to have been committed for the purpose of benefiting, promoting, or furthering the interests of a criminal gang as defined in s. 874.03; or

c. Arrested for any felony offense or attempted felony offense in this state.

Fla. Stat. § 943.325(2)(g).   A "DNA sample" means a buccal or other approved biological specimen capable of undergoing DNA analysis. Fla. Stat. § 943.325(2)(f).

Defendant contends that Fla. Stat. § 943.325, the statute relied upon by the officers in taking Defendant's DNA, is unconstitutional because it exceeds the scope permitted by the Fourth Amendment, as held by the United States Supreme Court in *Maryland v. King*, 133 S.Ct. 1958, 1968-69 (2013). (Doc. 21 p. 6).   Alternatively, Defendant argues that even if Fla. Stat. § 943.325 is constitutional, the officers nevertheless failed to comply with Fla. Stat. § 943.325's requirements. (Doc. 37 p. 6).

The Government responds that the DNA evidence was legally seized pursuant to Fla. Stat. § 943.325 which does not violate the Fourth Amendment. (Doc. 23 p. 6).   The Government argues that buccal swab collection is a reasonable search that does not significantly intrude upon felony arrestees' privacy rights and does not violate the Fourth Amendment. (Doc. 23 p. 8).   The

Government argues that even if Fla. Stat. § 943.325 is deemed unconstitutional, the good faith exception to the exclusionary rule applies. (Doc. 23 p. 8).

### 1) Constitutionality of Fla. Stat. § 943.325

Whether Fla. Stat. § 943.325 is constitutional in light of the Supreme Court's holding in *King* appears to be an issue of first impression.  In *King*, the Supreme Court analyzed whether a Maryland statute which authorized law enforcement authorities to collect DNA samples from "an individual who is charged with . . . a crime of violence or an attempt to commit a crime of violence; or . . . burglary or an attempt to commit burglary" violated the Fourth Amendment. 133 S.Ct. at 1967 (citing Md. Pub. Saf. Code Ann. § 2—504(a)(3)(i) (Lexis 2011)).  The defendant in the case, Alonzo King, had been arrested in Maryland in 2009, and charged with first and second-degree assault. *Id.* at 1965.  A buccal swab DNA sample was taken from King as part of a routine booking procedure which was found to match the DNA from an unsolved rape case from 2003. *Id.*  Police subsequently obtained a search warrant and took a second sample of DNA from King, which again matched the DNA evidence from the rape. *Id.* at 1966.  King moved to suppress the DNA evidence on the grounds that Maryland's DNA collection law violated the Fourth Amendment. *Id.*  The trial court denied King's motion and found that the statute was constitutional. *Id.*  King was convicted of the rape charge and sentenced to life in prison. *Id.*  King appealed his conviction to the Maryland Court of Appeals which entered an opinion striking down the portions of the Act authorizing collection of DNA from felony arrestees as unconstitutional. *Id.*

The case was appealed to the Supreme Court which held that DNA evidence taken as part of a routine booking procedure for identification purposes does not violate the Fourth Amendment. *Id.* at 1980.  The Supreme Court reasoned that buccal swab searches fall within the category of cases which are analyzed by reference to reasonableness, not individualized suspicion. *Id.* at 1970.

(citing *Samson v. California*, 547 U.S. 843, 855 n.4 (2006)).   To determine reasonableness the Supreme Court weighed the promotion of legitimate governmental interests against the degree to which the search intrudes upon an individual's privacy. *Id.* (citing *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

The Supreme Court found that Maryland's statute served numerous governmental interests such as identifying the individual in custody, providing a comprehensive record of the suspect's identity, helping law enforcement determine a detainee's risk of flight, and exonerating those wrongfully convicted. *Id.* at 1970-1977.   These governmental interests were weighed against the intrusion into the diminished privacy expectations of an individual in custody for a serious offense. *Id.* at 1977-78.   The Supreme Court noted that a buccal swab is a minimal intrusion which involves virtually no risk, trauma, or pain. *Id* at 1979.   In addition, the manner of processing the DNA specified by the statute revealed no private medical information of the individual.  *Id.* at 1967.   The Maryland statute also had safeguards to protect the privacy of suspects who ultimately beat their charges, such as the destruction of the DNA sample if probable cause is not established at arraignment, of if the suspect is ultimately acquitted or pardoned of the offense. *Id.*

In light of *King*, Defendant argues that Fla. Stat. § 943.325 is unconstitutional on two grounds.   First, Defendant argues that the statute is unconstitutional because it applies to all individuals arrested for felonies, not simply violent felonies. (Doc. 37 p. 10).   Second, the statute does not limit the use of the compelled sample to those purposes which are associated with routine booking. (Doc. 37 p. 10).

Contrary to Defendant's interpretation, the Court does not read *King* to require that a DNA collection statute specify that DNA samples be taken only from perpetrators of "violent felonies" in order to be constitutional under the Fourth Amendment.  *See Haskell v. Harris*, 745 F.3d 1269,

1271 (9th Cir. 2014) (per curiam) (providing that under *King*, California's DNA collection scheme is clearly constitutional as applied to anyone arrested for or charged with a felony offense, not just those arrested for violent felonies).  Conspicuously, the Supreme Court did not limit its holding in *King* to arrestees of violent felonies:

> the Court concludes that DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure.  When officers make an arrest supported by probable cause to hold for a **serious offense** and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.

*King*, 133 S.Ct. at 1980 (emphasis added).  The Court does not read the Supreme Court's usage of the term "serious offense" as a mere place holder for "violent felony."  As noted by Judge Smith in a concurring opinion in *Haskell*, a felony is certainly a serious crime.  *See* Black's Law Dictionary 694 (9th ed. 2009) (defining felony as "[a] serious crime usu[ally] punishable by imprisonment for more than one year or by death.").  In addition, Judge Smith noted that in outlining the scope of its decision, the Supreme Court explained that "[b]oth federal and state courts have reached differing conclusion as to whether the Fourth Amendment prohibits the collection and analysis of a DNA sample from persons arrested, but not yet convicted, on *felony charges.*" *Haskell*, 745 F.3d at 1273 (citing *King*, 133 S.Ct. at 1966)).  The Supreme Court then provided that it granted "certiorari . . . to address the question." *Id.*  Thus, the Court reads *King* to apply to DNA searches of arrestees for all felonies, not just "violent felonies."  Accordingly, the Court does not find Fla. Stat. § 943.325 to be unconstitutional on such grounds.

Likewise, the Court rejects Defendant's argument that Fla. Stat. § 943.325 is unconstitutional because it is not constrained to purposes associated with routine booking. The statute specifies that "[a]rrested qualifying offenders must submit a DNA sample at

the time they are booked into a jail, correctional facility, or juvenile facility." Fla. Stat. § 943.325(7)(b).  "The analyses of DNA samples collected under this section shall be used only for law enforcement identification purposes . . . and may not be used for identification of any medical or genetic condition." Fla. Stat. § 943.325(13)(b) (emphasis added).  Thus, the purpose for which DNA samples can be collected under Fla. Stat. § 943.325 is in accord with the Supreme Court's conclusion in *King* that "DNA identification of arrestees is a reasonable search that can be considered a part of a routine booking procedure." *King*, 133 S.Ct. at 1980.[3]

### 2)  Conduct of the Law Enforcement Officers

Although the Court finds Fla. Stat. § 943.325 constitutional, it remains to be determined whether law enforcement's conduct in this case complied with the statute and the Fourth Amendment.  In this case, the Court finds that the Government failed to carry its burden of establishing that law enforcement's conduct was not in violation of Fla. Stat. § 943.325 and the Fourth Amendment.  The testimony presented at the hearing shows that a sample of Defendant's DNA was not taken only for the purposes of identification as required by Fla Stat. § 943.325, but in furtherance of law enforcement's case against Defendant for being a felon in possession of a firearm.  Officer Petaccio testified that the police report written in connection with this incident specified that the buccal swab was obtained from Defendant for DNA comparison to the firearm by the Florida Department of Law Enforcement. (Tr. 44).  Detective Hernandez also testified that the purpose for

---

[3]  As the Court finds Fla. Stat. § 943.325 constitutional, the Court does not address the Government's alternative arguments that the good faith exception to the exclusionary rule should apply. (Doc. 23 p. 8-9; Doc. 36).

taking the buccal swab was to see if it could be compared to the firearm that was seized. (Tr. 55).  Officer Petaccio and Detective Hernandez both testified as well that the DNA samples were taken for the purpose of identifying Defendant. (Tr. 52, 53-54).  However, this testimony does not show that law enforcement's conduct complied with Fla. Stat. § 943.325.  Fla. Stat. § 943.325(13)(b) requires that the analysis of DNA samples shall be used <u>only</u> for law enforcement identification purposes.  Thus, while the taking of Defendant's DNA for normal booking identification purposes was compliant with the statute, the taking of his DNA to compare it to the DNA found on the firearm was conduct exceeding the scope of the search allowed under the statute.

The Government argues that "identification" encompasses not merely a person's name, but also a broader investigatory use of DNA evidence. (Doc. 23 p. 7) (citing to *Haskell v. Harris*, 669 F.3d 1049 (9th Cir. 2012) *reh'g en banc granted*, 686 F.3d 1121 (9th Cir. 2012) and *on reh'g en banc,* 745 F.3d 1269 (9th Cir. 2014)) .  Thus, according to the Government, Defendant's DNA swab was used for the purpose of identification by linking Defendant to the crime of possession of a firearm by a felon. (Doc. 23 p. 7).  The Court rejects the Government's expansive construction in which "identification" is synonymous to "investigation."  Such a broad construction would enable law enforcement to take DNA samples under Fla. Stat. § 943.325 for purposes other than those found proper in *King*.  In *King*, law enforcement connected King to the unsolved rape case when it entered his DNA profile into Maryland's DNA database. *King*, 133 S.Ct. 1966.  The Supreme Court noted that "[t]he task of identification necessarily entails searching public and police records based on the identifying information provided by the arrestee to see what is already known about him." *Id.* at 1972.  In this way, information showing a link

between the arrestee and the unsolved crime is essentially a by-product of the attempt to identify the arrestee through searching records law enforcement already has on hand. *See id.* (providing that searching official records is a "routine matter to produce a more comprehensive record of the suspect's complete identity" and that finding occurrences of the arrestee's DNA profile in outstanding cases is consistent with this common practice).

Such a search of public police records is not the case, here. There is no evidence that Defendant's DNA was searched through any type of database that may be used to help the government to identify him or even connect him to any outstanding cases already on file. Instead, law enforcement appears to have directly compared Defendant's DNA sample with the DNA evidence found on the firearm seized as part of Defendant's arrest. This comparison in no way furthers the purpose of identifying Defendant, but only serves the investigatory purpose of determining whether Defendant was in possession of the firearm.

Additionally, the facts of this case give rise to Fourth Amendment concerns due to law enforcement's discretion in taking the buccal swab samples. In *King*, the Maryland statute held constitutional deprived law enforcement of discretion in the taking of buccal swab samples. Thus, the Supreme Court remarked, "[t]he DNA collection is not subject to the judgment of officers whose perspective might be colored by their primary involvement in 'the often competitive enterprise of ferreting out crime." *King*, 133 S.Ct. at 1970 (citations omitted). Fla. Stat. § 943.325 requires that qualifying offenders *shall* be required to submit a DNA sample to a department-designated facility. The Court agrees with the Defendant that the statute contemplates an automatic and routine process where all felony arrestees will be required to provide a DNA sample. (Doc. 37 p. 8-9). This seems to be the

understanding of the law enforcement officers who testified at the evidentiary hearing that a policy is currently being implemented that will require all felony arrestees to provide a sample. (Tr. 42-43).  This policy was not in effect, however, at the time Defendant's DNA sample was taken. (Tr. 30, 43).  At the time Defendant's DNA was taken, the decision to obtain a DNA sample was at the discretion of the officer on the scene and the detective. (Tr. 43).  In this case, Officer Petaccio specifically testified that Defendant's DNA was taken at his discretion. (Tr. 43).

Officer discretion is a consideration in the analysis of the reasonableness of a warrantless search. *See Treasury Employees v. Von Raab*, 489 U.S. 656, 667 (1989).  Here, the testimony of the officers that the purpose of the DNA sample was for investigatory purposes further illustrates the need for a detached, neutral magistrate to review the conduct of law enforcement.  The conduct of law enforcement in this case seems to be exactly the type the Supreme Court was worried of when it stated that the judgment of officers may be colored by their primary involvement in the competitive enterprise of ferreting out crime.

As law enforcement's conduct in this case exceeded the conduct permissible under Fla. Stat. § 943.325 and the Fourth Amendment, the Court recommends that the District Court suppress the DNA buccal swab sample taken from Defendant at the Fort Myers Police Department.

**IT IS RESPECTFULLY RECOMMENDED THAT:**

Defendant's Motion to Suppress Evidence (Doc. 21) be **GRANTED** to the extent that the buccal swab DNA sample taken at the Fort Myers Police Department be suppressed, and the Motion to Suppress Evidence be **DENIED** in all other respects.

**Respectfully recommended** in Chambers in Fort Myers, Florida on October 24, 2014.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

## <u>NOTICE TO PARTIES</u>

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date it is served on the parties shall bar an aggrieved party from a de novo determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02

Copies furnished to:

Counsel of Record
Unrepresented Parties